No. 24-7360

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

EDWARD ALLYN HUDACKO

Plaintiff – Appellant

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA; STEPHEN
ROSENTHAL, MD; JANET YI MAN LEE, MD; DIANE EHRENSAFT, PHD;
ASAF ORR; NATHANIEL BIGGER; DANIEL HARKINS; CHRISTINE
UNDERHILL

Defendants - Appellees

Appeal from the Northern District of California
Case no. 3:23-CV-05316-SI
Hon. Susan B. Illston
U.S. District Judge

## APPELLANT'S OPENING BRIEF

TRACY L. HENDERSON, ESQ. SBN 252888
LAW OFFICE OF TRACY L. HENDERSON, ESQ.
P.O. BOX 221562
CARMEL, CA 93922-1562
(TEL.) 831-917-1583
(EMAIL) TLHLAW@PROTONMAIL.COM
ATTORNEY FOR PLAINTIFF EDWARD ALLYN HUDACKO

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................2

TABLE OF AUTHORITIES ....................................................................5

I.  INTRODUCTION ............................................................................9

II.  STATEMENT OF THE CASE ......................................................10

  A.  Factual Background ....................................................................10

  B.  Procedural History ......................................................................12

    1.  Original and First Amended Complaint ..................................12

    2.  The "Abstention" Issue ..........................................................13

    3.  Order Dismissing FAC ...........................................................13

    4.  Second Amended Complaint ...................................................13

    5.  Order Dismissing SAC ...........................................................14

III.  JURISDICTIONAL STATEMENT .............................................14

IV.  QUESTIONS PRESENTED ..........................................................14

V.  STANDARD OF REVIEW ............................................................15

VI.  ARGUMENT ..................................................................................16

  A.  The District Court Erred by Finding Hudacko Did Not Plausibly Allege Conspiracy, Which Flowed from the Erroneous Decision to Decline Judicial Notice of Past Historical Examples of Involuntary Human Medical Experimentation, and of the Raging National Dispute Around "Gender Affirming Care"...................................................................................16

    1.  Judicial Notice Was Requested to Show Plausibility of Conspiracy .....16

      a)  Legal Standard Regarding Judicial Notice .........................16

      b)  The plausibility pleading standard.....................................16

    2.  The District Court Ignored a Litany of Facts Distinguishing *Hudacko* from *Iqbal*.................................................................17

    3.  The Past Historical Examples Are Adjudicative Facts .........................20

      a)  Legal Standard for Adjudicative Facts ...............................20

      b)  The Tuskegee Syphilis Study .............................................21

c) Project MKULTRA ...................................................................22

d) NIH STD Experiments in Guatemala ...................................22

e) Lobotomy ..................................................................................22

f) Leo Stanley Experiments ......................................................23

g) Nazi Medical Experiments ....................................................23

4. In Addition to Plausibility, the Past Historical Examples of State-Funded Unethical Medical Experiments Must Be Considered "Adjudicative Facts" Because They Show Motive and Intent of These Defendants .......................23

5. The Nuremberg Code is Law ...............................................25

6. The Past Historical Examples are Not Reasonably Subject to Dispute Say Reliable Sources ....................................................................27

7. The Court Need Not Rely on Wikipedia ...........................30

8. It is Legal Error to Deny the Holocaust, Judge Illston is a Holocaust Denier ...................................................................................31

9. Conclusion to Judicial Notice and Dismissal of Conspiracy .................32

B. The District Court Erred by Finding That the Non-Govt. Defendants are Not *De Facto* State Actors Under the Joint Action Test ...................................33

C. The District Court Erred by Granting the UCSF Defendants Qualified Immunity ..............................................................................................37

1. Legal Standard for Qualified Immunity .................................37

2. Hudacko Had a Clearly Established Constitutional Right to Direct the Medical Care of His Minor Child ...............................................38

3. The No Surgery Injunction Arose from Hudacko's Clearly Established Constitutional Right ....................................................................39

4. The District Court Failed to Assume Hudacko's Alleged Facts ...........42

5. Conclusion to Qualified Immunity ......................................44

D. The District Court Erred by Dismissing the Claims for Fraudulent Concealment ........................................................................................44

1. Orders of Dismissal and Legal Standard ...............................44

2. Defendants Owed a Duty to Disclose to Hudacko the Experimental Nature of the Supprelin Implant .................................................45

a) A Special Relationship Between Defendants and Plaintiff Was Established Upon the Issuance of the Family Court Order Explicitly Naming "UCSF" ....................................................................45

b)   Defendants Owed and Breached a General Duty of Care by Reciting the "Playbook" ............................................................ 46

c)   Defendants Waived the "No Duty" Defense by Voluntarily Speaking Falsely ...................................................................... 48

3.   Conclusion to Fraudulent Concealment .................................. 49

E.   The District Court Erred by Dismissing the Claim for Intentional Infliction of Emotional Distress .............................................................. 50

1.   The Court Dismissed, Finding Defendant's Conduct Not "Outrageous" 50

2.   The District Court Again Fails to Assume Hudacko's Facts ................. 50

3.   Conclusion to IIED .................................................... 52

F.   Judge Illston Should Be Disqualified For Demonstrating Bias Against Hudacko .................................................................. 52

1.   Legal Standard to Disqualify a Judge .................................... 52

2.   Raising the Issue of Judicial Bias for the First Time on Appeal ........... 53

3.   Judge Illston Demonstrated Judicial Bias Against Hudacko ................. 53

a)   No Legal Authority Supports "Abstention" from Ruling on Motions to Dismiss ..................................................................... 53

b)   Judge Illston Fashioned Defendants' Qualified Immunity Argument for Them .................................................................. 56

c)   Judge Illston Denied Facts on Behalf of Defendants ......................... 56

d)   Judge Illston is a Holocaust Denier ................................... 57

4.   Conclusion to Disqualification ........................................ 57

**VII.    OVERALL CONCLUSION AND RELIEF REQUESTED ................ 57**

**VIII.   CERTIFICATE OF COMPLIANCE ................................. 58**

**IX.     CERTIFICATE OF SERVICE .................................... 59**

# TABLE OF AUTHORITIES

U.S. SUPREME COURT CASES

*Adickes v. S.H. Kress & Co.* 398 U.S. 144 (1970) ...........................................34

*Ashcroft v. al-Kidd*, 563 U.S. at 741 ..............................................................42

*Ashcroft v. Iqbal*, 556 U.S. 662 .....................................................................17

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L.
   Ed. 2d 929 (2007) .....................................................................................16

*Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 725, 81 S.Ct. 856, 6
   L.Ed.2d 45 (1961) .....................................................................................36

*Carroll v. Karman*, 574 U.S. 13 ................................................................42, 43

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ............................................37

*Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 923, 102 S. Ct. 2744, 2746
   (1982) ......................................................................................................35

*Malley v. Briggs*, 475 U.S. 335, 341 (1986) ...................................................38

*Michael H. v. Gerald D.,* 491 U.S. 110, 123 (1989) .......................................38

*Moore v. Sims*, 442 U.S. 415, (1979) ............................................................54

*Parham v. J.R.*, 442 U.S. 584, 603 (1979) .....................................................39

*Santosky v. Kramer*, 455 U.S. 745 ...............................................................38

*Saucier v. Katz*, 533 U.S. 194, 202 (2001) ...............................................38, 40

*Stanley v. Illinois*, 405 U.S. 645, 651 (1972) ................................................38

*Troxel v. Granville*, 530 U.S. 57, 65 (2000) ........................................15, 38, 39

*Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) ....................................38

*Wilson v. Layne*, 526 U.S. 603, 615, 143 L. Ed. 2d 818, 119 S. Ct. 1692
   (1999) ......................................................................................................40

*Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972) ..............................................38

STATE SUPREME COURT CASES

*Rowland v. Christian, 69 Cal. 2d 108* ............................................................46

FEDERAL CASES

*Abdullahi III*, 2005 U.S. Dist. LEXIS 16126, 2005 WL 1870811, at *9 ........26

*Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 182 (2d Cir. 2009) ...........................25

*AmerisourceBergen Corp. v. Roden*, 495 F.3d 1143, 1144 ............................55

*Ball v. Massanari*, 254 F.3d 817 .....................................................................15

*Barrett v. Harwood*, 189 F.3d 297, 304 (2d Cir. 1999) ..................................34

*Bernard v. Coyne (In re Bernard)*, 31 F.3d 842, 843 (9th Cir. 1994).............53

*Botello v. Gammick*, 413 F.3d 971, 973 .........................................................15

*BP Products North America, Inc. v. United States*, 716 F.Supp.2d 1291, 1295, n. 10 ...............................................................................................30

*Buechold v. Ortiz*, 401 F.2d 371, 372 (9th Cir. 1986)....................................54

*Castillo-Villagra v. I.N.S.*, 972 F.2d 1017, 1026 (9th Cir. 1992)...................24

*Coats v. Woods*, 819 F.2d 236, 237 (9th Cir. 1987)........................................54

*Crispin v. Christian Audigier, Inc.*, 717 F.Supp.2d 965, 976, n. 19 (2010)....30

*Doe v. Snyder*, 28 F.4th 103, 106....................................................................20

*Ervin v. Judicial Council of California*, 2005 U.S. Dist. LEXIS 56164, *8 .....................................................................................................................27

*Experimental Engineering, Inc. v. United Technologies Corp.*, 614 F.2d 1244, 1245 ........................................................................................42

*Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1277 (11th Cir. 2003) ........................................................................35

*Glen Holly Entertainment, Inc. v. Tektronix, Inc.*, 100 F.Supp.2d 1086, 1089 (C.D. Cal. 1999) .........................................................................42

*Iida v. Allied Signal (In re Hawaii Fed. Asbestos Cases)*, 854 F. Supp. 702, 704 ............................................................................................43

*In re Manoa Finance Co.*, 781 F.2d 1370, 1373 (9th Cir. 1986)....................53

*In re Tyrone F. Conner Corp.*, 140 B.R. 771, 781 ..........................................16

*Jones v. Johnson*, 781 F.2d 769, 772, n. 1 (9th Cir.1986)..............................42

*Korematsu v. United States*, 584 F. Supp. 1406, 1409...................................24

*Kuciemba v. Victory Woodworks, Inc.*, 74 F.4th 1039, 1040.........................47

*Marshall v. Sawyer*, 365 F.2d 105, 111 (9th Cir. 1966).................................24

*National Broad. Co., Inc. ("NBC") v. Communications Workers of Am., AFL-CIO*, 860 F.2d 1022, 1026-27 (11th Cir. 1988) ..................................35

*Peterson v. Babbitt*, 708 F.2d 465, 466 (9th Cir. 1983).................................54

*Planet Drum Found. v. Hart*, 2017 U.S. Dist. LEXIS 156674, *15 ..............31

*Polanco v. E. Chigago Mach. Tool Corp.*, No.
CV1108927MMMMRWX, 2012 U.S. Dist. LEXIS 196286, 2012 WL
12886209, at \*4 (C.D. Cal. June 26, 2012) .................................................30

*Rosedale Plaza Group, LLC v. BP West Coast Products LLC*, 665 F.
Supp. 2d 1118, 1134-1135 .............................................................................51

*Smith v. Brookshire Bros.*, 519 F.2d 93 (5th Cir. 1975)...................................34

*Tiller v. Amerada Hess Corp.,* 540 F.Supp. 160, 165 (D.S.C.1981)...............51

*United States v. Bosch*, 951 F.2d 1546, 1552....................................................53

*United States v. Sibla*, 624 F.2d 864, 868 (9th Cir. 1980) ...............................53

*Wallis ex rel. Wallis v. Spencer*, 202 F.3d 1126 at 1136.................................39

*Willis v. Univ. Health Servs.*, 993 F.2d 837 (11th Cir. 1993) .........................35

*Winans v. Cox Auto.*, Inc., 669 F. Supp. 3d 394, 403 .....................................25

STATE CASES

*Bidna v. Rosen*, 19 Cal. App. 4th 27, 30 ..........................................................54

*Cochran v. Cochran*, 65 Cal. App. 4th 488, 496 (1998)...................................51

*Graham v. Bank of Am., N.A.*, 226 Cal. App. 4th 594, 605-06 .......................44

*People v. Conrad* (1997) 55 Cal.App.4th 896, 64 ...........................................55

STATUTES

28 U.S.C. § 1291 ................................................................................................14

28 U.S.C. § 1331 ................................................................................................14

28 U.S.C. § 455(a)..............................................................................................53

28 U.S.C. § 455(b)(1).........................................................................................53

42 U.S.C. § 1983 ................................................................................................14

Cal. Civ. Code § 1714 (a)...............................................................................46, 47

Cal. Health & Saf. Code § 24170 .....................................................................26

Fed. R. Civ. Pro. 12(b)(6) .................................................................................42

Fed. R. Evid. 201(a) ..........................................................................................21

Fed. R. Evid. 201(b).......................................................................................16, 27

Fed. R. Evid. 401...............................................................................................24

<u>OTHER AUTHORITIES</u>

90 FR 8771 ............................................................................... 16, 18, 22, 34

*California Judge Rules Holocaust Did Happen* New York Times,
   October 10, 1981, Section 1, Page 26 ...........................................32

Los Angeles Superior Court case no. C356542, *Mel Mermelstien v.
   Institute for Historical Research, et. al.* .......................................32

Rest. 2d Torts § 46 ...........................................................................51

Sauer, Patrick, *Mel Mermelstein Who Survived Auschwitz, Then Sued
   Holocaust Deniers in Court, Dies at 95* Smithsonian Magazine,
   Updated: January 31, 2022 | Originally Published: August 27, 2018 ........32

The Nuremberg Code ........................................................................25

U.S. Supreme Court Dec. 4, 2024, oral argument in *U.S. v. Skrmetti*, No.
   43-477, transcript p. 141:22-142:9 ..............................................29

*United States of America v. Karl Brandt, et. al* ...........................26, 31

*William W. Schwarzer et al.*, California Practice Guide: Federal Civil
   Procedure Before Trial ¶ 14:192 (1998).......................................27

Woo, Elaine *Thomas T. Johnson dies at 88; judge ruled that Holocaust
   was a fact* Los Angeles Times, Dec. 31, 2011 ...........................32

# APPELLANT'S OPENING BRIEF

## I.    INTRODUCTION

This case arises because Stephen Rosenthal MD and the other Defendants conspired to violate the clearly established constitutional rights of Plaintiff Ted Hudacko by performing a gender identity related surgery on his son, when everyone knew that was expressly prohibited under a valid court order.

Defendants' actions here are part of a larger conspiracy to commit involuntary human medical experimentation on gender-confused children under the pretense of medically "transitioning" them into the opposite sex. This nation-wide practice goes by the name of "gender-affirming care," but that's a misnomer. The sterilizing, cancer-causing, brain-and-bone-damaging puberty blocker drugs at the heart of this scam have *never* been shown to be safe **or** effective. And yet, doctors, NIH-funded researchers and their lawyers (including the Defendants in this case) falsely portray them as "medically necessary" to treat gender dysphoria while surreptitiously enrolling unsuspecting children into the experiment for big money.

The District Court dismissed this entire case, finding that Hudacko, the constitutionally-violated, emotionally-devastated and financially-damaged father of one such child, did not plausibly allege facts sufficient to constitute a conspiracy, or to plead the elements needed for the civil rights, fraud and emotional distress claims he brought. Given that the President of the United States and a growing number of high-ranking State and U.S. government officials now publicly allege the same fraud and the same conspiracy, the notion that Plaintiff did not plead a viable case is ridiculous.

For the reasons that follow, this case should be reversed and remanded, with instructions that Defendants must be compelled to answer the complaint.

## II.   STATEMENT OF THE CASE

### A.   <u>Factual Background</u>

Plaintiff and Appellant Edward Allyn "Ted" Hudacko ("Plaintiff", "Appellant" or "Hudacko") is the father of the minor child. Relying on the false representations by UCSF, Defendant Underhill, the boy's mother, desired to turn the boy into a girl. [6-ER-956]

An August 2020 State Law injunction prohibited "any gender-identity related surgery" on Minor Child without Hudacko's consent ("No Surgery Injunction"). [6-ER-953]

Defendants all knew about the No Surgery Injunction. [6-ER-960]

Hudacko would never consent to any "gender affirming care" on the child, and all Defendants knew this. [6-ER-968]

On 08/04/2021, as part of a joint agreement between Defendants, a Supprelin Implant was performed on Minor Child. Supprelin ™ is a puberty blocker. [6-ER-953]

Defendant Stephen Rosenthal, MD ("Rosenthal") is an endocrinologist at UCSF, co-director of the Child and Adolescent Gender Center, a principal investigator in NIH-funded experiments involving gender affirming care on minors, and a member of the World Professional Association for Transgender Health ("WPATH"). [6-ER-956]

Defendant Janet Yi Man Lee, MD ("Lee") is a pediatric endocrinologist and surgeon at UCSF, and a member of WPATH. [6-ER-957]

Defendant Diane Ehrensaft, PhD ("Ehrensaft") is a clinical psychologist at UCSF, and a member of WPATH. [6-ER-957]

Defendant Asaf Orr ("Orr") is an attorney, transgender activist, legal educator and Legal Director of Child and Adolescent Gender Center at UCSF. [6-ER-957]

Defendant Nathaniel Bigger ("Bigger") is the attorney representing Underhill in the Family Law Case. [6-ER-957]

Defendant Daniel Harkins ("Harkins") is the court-appointed attorney representing Minor Child in the Family Law Case. [6-ER-957]

Defendant Christine Underhill ("Underhill") is the mother of Minor Child, at all times wishing to "transition" Minor Child from being a boy into being a girl, falsely believing "gender affirming care" is safe & effective. [6-ER-957]

Gender dysphoria is a purely psychological condition. [6-ER-961]

Defendants (except possibly Underhill) all knew that puberty blockers have never been proven safe or effective under the standards of evidence-based medicine; that they can cause sterility, bone loss, and loss of brain development, among other problems. [6-ER-963]

WPATH – an organization that purports to be dedicated to evidence-based care – published "Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People 8th Edition." [6-ER-961]

In 2024 newly leaked documents demonstrate WPATH is unscientific. [6-ER-970]

The True WPATH Mission includes overstating the alleged risks of "untreated" gender dysphoria; maximizing the profit of gender clinics by maximizing the number of children seeking "gender affirming care;" falsely proclaiming psychological benefits; fraudulently concealing harms; and unwittingly enrolling children into experimental protocols. [6-ER-962]

The WPATH Defendants knew that suppressing puberty causes permanent, irreversible negative effects on mental function. [6-ER-955]

The WPATH Defendants executed the "Playbook," deliberately concealing from everyone the lack of high-quality evidence showing puberty blockers to be effective for treating gender dysphoria, and concealing a litany negative consequences. [6-ER-955]

WPATH Defendants concealed that Hudacko's son was secretly enrolled in an NIH-funded human medical experiment. [6-ER-955]

Had Underhill been properly informed she would not have consented on behalf of Minor Child. [6-ER-955]

Defendant Asaf Orr is a lawyer who advised the WPATH Defendants. Orr advances the True WPATH Mission by teaching (along with Joni Hiramoto, the former judge in the Hudacko Family Law Case) the "Playbook" to minor's counsels, including Defendant Harkins. [6-ER-955-956]

Defendants formulated, concealed and executed a plan to perform Supprelin Implant knowing it was in violation of the No Surgery Injunction, without any consent from Hudacko, and with Underhill's "consent" obtained fraudulently. [6-ER-956]

## B. Procedural History

### 1. Original and First Amended Complaint

On 10/26/2023, Plaintiff filed First Amended Complaint ("FAC") *in pro per.* It was identical to the original, except in abundance of caution Plaintiff redacted the name of Minor Child. [8-ER-1650]

From 12/05/2023 - 12/18/2023, all Defendants filed 12(b)(6) Motions to Dismiss the FAC. [8-ER-1631], [8-ER-1590], [8-ER-1500]

During the same time period, Defendants filed Requests for Judicial Notice ("RJN"). [8-ER-1627], [8-ER-1523]

On 12/19/2023 Hudacko filed RJN seeking notice of Endo Pharmaceuticals published literature establishing that Supprelin ™ Implant is a surgical procedure. [8-ER-1498]

From 12/19/2023 - 01/17/2024, Hudacko filed Oppositions to the Defendants Motion to Dismiss. [8-ER-1477], [8-ER-1413], [8-ER-1384]

Defendant timely filed Reply Briefs. [8-ER-1468]

### 2. The "Abstention" Issue

On 02/05/2024, the District Court issued ORDER RE: UPDATE ON STATE COURT CONTEMPT PROCEEDING, ordering parties to submit a short statement by February 7, 2024 about the status. [1-ER-59]

On 02/05/2024, Defendants filed JOINT STATEMENT. [7-ER-1114]

On 02/06/2024 Plaintiff filed PLAINTIFF'S SHORT STATEMENT. [7-ER-1107]

On 05/17/2024, the District Court held a hearing on the Motions to Dismiss. The tentative ruling was to abstain from ruling on the Motions at all. [1-ER-58]

### 3. Order Dismissing FAC

On 08/20/2024, finding that Plaintiff had voluntarily dismissed his Contempt motion, the District Court issued ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS. [1-ER-32]

### 4. Second Amended Complaint

On 08/30/2024, Plaintiff filed Second Amended Complaint ("SAC"). [6-ER-952]

On 09/20/2024, Defendants all filed Motions to Dismiss the SAC. [6-ER-937], [6-ER-925], [6-ER-900], [6-ER-865], [6-ER-855] The WPATH Defendants filed Request for Judicial Notice. [6-ER-898]

On 10/18/2024, Plaintiff filed Oppositions to the MTD SAC. [6-ER-840], [6-ER-810], [4-ER-499], [4-ER-479], [4-ER-459]

On 10/18/2024, Hudacko filed REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF OPPOSITION TO MOTIONS TO DISMISS THE SECOND AMENDED COMPLAINT [5-ER-512].

On 11/01/2024, Defendants filed Reply Briefs. [2-ER-151], [2-ER-142], [2-ER-136], [2-ER-122], [2-ER-114], and [2-ER-99]

On 11/01/2024 the WPATH Defendants filed OBJECTION TO PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE. [2-ER-107]

On 11/01/2024 Defendant Harkins filed OBJECTIONS TO PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE. [2-ER-136]

On 11/05/2024, Plaintiff filed PLAINTIFF'S RESPONSE TO DEFENDANTS ROSENTHAL, EHRENSAFT AND LEE OBJECTION [2-ER-80]

On 11/10/2024, Plaintiff filed PLAINTIFF'S RESPONSE TO DEFENDANT HARKINS OBJECTIONS [2-ER-61]

### 5.     Order Dismissing SAC

On 11/25/2024, the District Court entered ORDER RE: MOTIONS TO DISMISS, dismissing all causes of action. [1-ER-3]

On 11/26/2024, the District Court entered Judgment against plaintiff and in favor of defendants. [1-ER-2]

## III.   JURISDICTIONAL STATEMENT

The United States District Court for the Northern District of California ("District Court") had jurisdiction over the claims of Appellant pursuant to 28 U.S.C. § 1331, in that this action arises under the U.S. Constitution, and under 42 U.S.C. § 1983.

Jurisdiction for this Honorable Ninth Circuit Court of Appeals is given at 28 U.S.C. § 1291, in that Plaintiffs are appealing the District Court's 11/26/2024 Judgment [1-ER-2], which makes final the 11/25/2024 Order Re: Motions to Dismiss [1-ER-3-26] and 8/20/2024 Order Granting in Part and Denying in Part Defendants' Motions To Dismiss. [1-ER-28-57].

## IV.   QUESTIONS PRESENTED

A. Did the District Court err by finding Hudacko did not plausibly allege conspiracy, which flowed from the erroneous decision to decline Judicial Notice of Past Historical Examples of involuntary human medical experimentation, and of the raging national dispute around "gender affirming care"?

B. Did the District Court err by finding that the non-govt. Defendants are not *de facto* state actors under the Joint Action test?

C. Did the District Court err by granting the UCSF defendants qualified immunity?

D. Did the District Court err by dismissing the claim for Fraud by Concealment, finding UCSF had no duty to disclose to Plaintiff the fact that they were performing involuntary human medical experimentation on minor children?

E. Did the District Court err by dismissing the claim for IIED?

F. Should Judge Illston be disqualified for demonstrating judicial bias?

## V.    STANDARD OF REVIEW

"A dismissal under Fed. R. Civ. P. 12(b)(6) for failure to state a claim is reviewed *de novo*. The factual allegations in the complaint are assumed to be true." (*Botello v. Gammick*, 413 F.3d 971, 973)

The fundamental constitutional right to parent is at issue in every aspect of this appeal. The U.S. Supreme Court expressed the view that:

> (1) the Fourteenth Amendment's due process clause protected **the fundamental right of parents** to make decisions concerning the care, custody, and control of their children.

(*Troxel v. Granville*, 530 U.S. 57, 60, (2000) (*"Troxel"*), bolding added)

Thomas, J., concurring in the judgment, expressed the view that the appropriate standard of review for the alleged infringement of fundamental constitutional rights was **strict scrutiny.** [*Id*]

The Ninth Circuit is in accord:

> If the statute ... burdens the exercise of a constitutional right, then courts must apply **strict scrutiny**.

[*Ball v. Massanari*, 254 F.3d 817, 823, bolding added]

Accordingly, the appropriate standard of review for this entire appeal is a *de novo* review under strict scrutiny.

## VI. ARGUMENT

### A. The District Court Erred by Finding Hudacko Did Not Plausibly Allege Conspiracy, Which Flowed from the Erroneous Decision to Decline Judicial Notice of Past Historical Examples of Involuntary Human Medical Experimentation, and of the Raging National Dispute Around "Gender Affirming Care"

#### 1. Judicial Notice Was Requested to Show Plausibility of Conspiracy

##### a) Legal Standard Regarding Judicial Notice

Under Federal Rule of Evidence 201, a "court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." (Fed. R. Evid. 201(b)).

A Court is **compelled** to take judicial notice of such adjudicative facts under Federal Rule of Evidence 201(d) when requested by a party and supplied with the necessary information. *In re Tyrone F. Conner Corp.*, 140 B.R. 771, 781, bolding added).

Regarding Wikipedia, it will be shown that the online encyclopedia is not the only source available for the Past Historical Examples, nor was it the only source offered.

##### b) The plausibility pleading standard

Plaintiffs allege that Defendants are engaged in a conspiracy to commit involuntary human medical experimentation on minors, what President Trump now terms "chemical and surgical mutilation." (90 FR 8771). The Court must assume all factual allegations as true, unless they are found to be "implausible." "Plaintiff must plead 'enough facts to state a claim to relief that is **plausible on its face**.'", bolding added). (*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)

Citing *Ashcroft v. Iqbal*, 556 U.S. 662 at 680-681, comparing that case to this one, the District Court dismisses the case, finding "the allegations [of conspiracy] are likewise conclusory in nature." [1-ER-15] The District Court has ignored many facts that, once considered, sharply distinguish *Hudacko* from *Iqbal.*

## 2. The District Court Ignored a Litany of Facts Distinguishing *Hudacko* from *Iqbal*.

The District Court ignored that the entire "gender affirming care" industry is predicated on a dishonest claim that puberty blockers and wrong-sex hormones are "safe, effective, and medically necessary" for minors. The District Court ignored that recent reports show that "gender affirming care" is medically dangerous to minors, and has never been shown safe & effective under the standards of evidence-based medicine. [6-ER-953] There is nothing analogous in *Iqbal.*

The District Court ignored that Defendant Orr and off-duty Family Court Judge Joni Hiramoto teach a video-taped class for Minor's Counsels (including Defendant Harkins) on how best to ensure that the parent opposing "gender affirming care" always loses custody. The class includes false representations about puberty blockers, and instructions on how to keep the actual scientific experts and studies *out* of evidence. [6-ER-964] There is nothing analogous in *Iqbal.*

The District Court ignored that, in addition to heading a major "gender clinic," Judicial Notice was requested of the fact that Defendant Rosenthal is a Principal Investigator in an NIH-funded experiment that "will be the first in the U.S. to evaluate the longterm outcomes of medical treatment for transgender youth." [3-ER-166] There is nothing analogous in *Iqbal.*

The District Court ignored that Judicial Notice was requested that the Alabama Attorney General alleges material factual disputes regarding the purported safety and efficacy of puberty blockers in treating gender dysphoria, the state of scientific research, and the truth about WPATH. [3-ER-166] There is nothing analogous in *Iqbal.*

The District Court ignored that Judicial Notice was requested of the fact that the Alabama Attorney General filed an amicus brief to the U.S. Supreme Court in the pending *Skrmetti* case alleging material factual disputes regarding the purported safety and efficacy of puberty blockers in treating gender dysphoria, the state of scientific research, and the truth about WPATH. [3-ER-167] There is nothing analogous in *Iqbal*.

This Court should now take Judicial Notice of the fact that on 01/28/2025 President Trump issued Executive Order no. 14187, "Protecting Children from Chemical and Surgical Mutilation." The EO states:

> Across the country today, medical professionals are maiming and sterilizing a growing number of impressionable children [such as Hudacko's son] under the radical and **false claim** that adults can change a child's sex through a series of irreversible medical interventions.

(90 FR 8771, bolding added)

The EO seeks to end the reliance on "junk science" (exactly as alleged here), and explicitly calls out WPATH for lacking scientific integrity (exactly as alleged here). While the EO does not use the term "conspiracy," given the number of people involved, such a massive conspiracy (exactly as alleged here) is certainly implied. (*Id*) There is nothing analogous in *Iqbal*.

The District Court ignored fact that, in response to Trump's EO no. 14187, several States' Attorneys General filed lawsuits disputing the facts around whether "gender affirming care" is junk science or good science, and disputing the massive conspiracy generally.[1] There is nothing analogous in *Iqbal*.

The District Court ignored the fact that on May 13, 2021 there was a conference call including Defendants Dan Harkins (minor's counsel), Asaf Orr

---

[1] See e.g. Harmon, Amy; Macur, Juliet (February 13, 2025). *"Judge Temporarily Stops Trump's Plan to End Funds for Trans Youths' Health Providers"*. The New York Times. ISSN 0362-4331

(UCSF attorney and transgender activist) and Nathan Bigger (Underhill's attorney) which included a discussion and agreement for Defendants to perpetrate the Scheme, i.e. to make money by performing a Supprelin Implant on Hudacko's child and to unwittingly enroll the child into the NIH medical experiment. [6-ER-975] There is nothing analogous in *Iqbal.*

The District Court ignored that the WPATH Defendants (Rosenthal, Ehrensaft and Lee) and the Nominally Private Actors (Orr, Harkins, Bigger and Underhill) are all willful participants in the plan to commit involuntary human medical experimentation, with a conference call, emails and the "progress notes" to prove it. [6-ER-975] There is nothing analogous in *Iqbal.*

The District Court ignored the fact of leaked internal WPATH documents showing the fraudulent nature of WPATH. [6-ER-967] There is nothing analogous in *Iqbal.*

The District Court ignored the fact that in UCSF's 6/8/2021 progress notes, Defendants state that "Mother is working with her attorney, [the child's] attorney and Asaf Orr, JD—everyone [except Hudacko] is working together [conspiring] to achieve resolution [of the Minor Child's having been born male] in the near future [by committing involuntary human medical experimentation]." [6-ER-971] There is nothing analogous in *Iqbal.*

The District Court ignored the 6/8/2021 UCSF statement acknowledging two issues with the proposed (yet prohibited) Supprelin Implant surgery: "resolution of insurance issues" because "father is not supportive of [Minor Child's] gender care." [6-ER-975] There is nothing analogous in *Iqbal.*

The District Court ignored the fact that UCSF billed and was paid $209,820.34 for the prohibited Supprelin Implant, and the fact that it was categorized as "SURGERY" on the Claim Detail for the surgery billing. [6-ER-967] There is nothing analogous in *Iqbal.*

Given that numerous high-ranking U.S. government officials are alleging the exact same conspiracy as Hudacko alleges here, this Court should find that it is plausible that that Defendants "maximize the number of human subjects – especially children – unwittingly enrolled into NIH-funded experimental protocols under the guise of medically necessary treatment." [4-ER-468].

Indeed, in a 2022 case brought by activist attorney and Defendant Asaf Orr, this Court ruled that gender affirming care is **not** "medically necessary and safe and effective for correcting or ameliorating his gender dysphoria." (*Doe v. Snyder*, 28 F.4th 103, 106)

### 3. The Past Historical Examples Are Adjudicative Facts
#### a) Legal Standard for Adjudicative Facts

Here, in support of his Opposition to Defendants' Motions to Dismiss, Hudacko requested Judicial Notice of numerous prior examples of state-funded involuntary human medical experimentation. Specifically, Plaintiff requested Judicial Notice of (1) the Tuskegee syphilis study, (2) Project MKULTRA, (3) the National Institutes of Health Sexually Transmitted Disease experiments in Guatemala, (4) the practice of lobotomy, (5) the Leo Stanley experiments, (6) the Nazi medical experiments. [3-ER-165-454]. Collectively, we shall refer to these as the "Past Historical Examples."

As explained in the papers, the relevance for each of those requests was to demonstrate "the *plausibility* of a conspiracy to use deception in the practice of involuntary human medical experimentation." [3-ER-162] The District Court denied Judicial Notice of the Past Historical Examples, holding that "because the fact that these studies exist does not concern the 'immediate parties' of this case." "Further," continues the District Court, citing Fed. R. Evid. 201(b)(2), "five of the six sources cited by plaintiff are Wikipedia pages, not sources whose accuracy cannot reasonably be questioned." [1-ER-8]

It will be shown that these Past Historical Examples constitute "adjudicative" (rather than "legislative") facts because they most certainly do "concern" these Defendants, despite not "involving" these Defendants. As the Courts explain, the difference between adjudicative and legislative facts is critical:

> Rule 201 governs only the judicial notice of adjudicative facts. Fed. R. Evid. 201(a). The advisory committee notes to Rule 201 distinguish between adjudicative facts and legislative facts. **Adjudicative facts** are facts that normally go to the jury in a jury case. They **relate to the parties**, their activities, their properties, their businesses. Adjudicative facts concern who did what, where, when, how and with what **motive or intent**. By contrast, **legislative facts do not relate** specifically to the activities or characteristics of the litigants. A court generally relies upon legislative facts when it purports to develop a particular law or policy and thus considers material wholly unrelated to the activities of the parties.

(*Cabardo v. Patacsil (In re Patacsil),* 2023 Bankr. LEXIS 536, *1, bolding added)

Notably, that the advisory committee does *not* say adjudicative facts must "involve" the instant Defendants. The Past Historical Examples "relate to" the instant Defendants and "concern" the instant Defendants because the prior experiments employed substantially the same "Playbook" as alleged here – unwitting participation in NIH funded experiments, false presentation of safe & effective treatment, truth concealed from the public and patients alike, and an utter lack of informed consent. [3-ER-162-167].

To further show how they "concern" and "relate to" these Defendants, let us review what took place in each of the Past Historical Examples for which Judicial Notice was requested.

### b) The Tuskegee Syphilis Study

From 1932 - 1972 the United States Public Health Service and the Centers for Disease Control conducted the "Tuskegee Study of Untreated Syphilis in the Negro Male," an unethical study where men were promised free medical care and were deceived by the officials, who never informed them that they had a diagnosis

of syphilis, nor that they were purposely left untreated despite the fact that medical advances had made syphilis entirely treatable. [5-ER-513]

### c) Project MKULTRA

From 1953-1973 the U.S. Central Intelligence Agency (CIA) conducted project "MKULTRA," a human experimentation program to develop procedures and identify drugs that could be used during interrogations to weaken individuals and force confessions through brainwashing and psychological torture, conducted at over 30 institutions and universities, involving testing drugs on unknowing citizens, including the issuing of LSD to unaware subjects in social situations. [5-ER-513-514]

### d) NIH STD Experiments in Guatemala

Beginning in 1946, the NIH engaged in research experiments where more than 5000 uninformed and unconsenting Guatemalan people were intentionally infected with bacteria that cause sexually transmitted diseases. The public had no knowledge of the NIH Guatemala experiments for more than half a century, and even today little is known about these violations of medical ethics and human rights. [5-ER-514]

The subjects included children, orphans, child and adult prostitutes, Guatemalan Indians, leprosy patients, mental patients, prisoners, and soldiers, i.e. particularly vulnerable people. Similarly, President Trump's recent EO characterizes the gender-confused children who fall prey to WPATH's tactics – such as Hudacko's son – as "vulnerable."   (90 FR 8771)

### e) Lobotomy

The practice of lobotomy in the U.S. was begun in 1936. A lobotomy or leucotomy is a discredited form of neurosurgical treatment for psychiatric disorder or neurological disorder (e.g. epilepsy, depression) that involves severing connections in the brain's prefrontal cortex.

Lobotomist Walter Freeman managed to promote the success of the surgery through the media, and lobotomy became touted as a miracle procedure, capturing the attention of the public and leading to an overwhelming demand for the operation.

The use of the procedure increased dramatically from the early 1940s and into the 1950s; by 1951, almost 20,000 lobotomies had been performed in the United States and proportionally more in the United Kingdom. A large number of patients were gay men.

Portuguese neurologist António Egas Moniz shared the Nobel Prize for Physiology or Medicine of 1949 for the "discovery of the therapeutic value of leucotomy in certain psychoses." [5-ER-515]

### f)   Leo Stanley Experiments

From 1913 to 1951, Leo Stanley, chief surgeon at the San Quentin Prison, performed a wide variety of experiments on hundreds of prisoners. Many of the experiments involved testicular implants, where Stanley would take testicles out of executed prisoners and surgically implant them into living prisoners. Stanley also attempted to implant the testicles of rams, goats, and boars into living prisoners. Stanley performed various eugenics experiments and forced sterilizations on prisoners. [5-ER-516]

### g)   Nazi Medical Experiments

From 1933-1945 a number of Nazi physicians conducted unethical medical experiments on thousands of human beings, including researching methods of sterilization.

### 4.   In Addition to Plausibility, the Past Historical Examples of State-Funded Unethical Medical Experiments Must Be Considered "Adjudicative Facts" Because They Show Motive and Intent of These Defendants

The District Court erred in finding the Past Historical Examples of state-funded involuntary human medical experimentation do not "concern" the

immediate parties of this case. A fact or an event can surely *concern* the immediate parties without *involving* immediate parties. Indeed, "courts have found it appropriate to take judicial notice of … **historical evidence** as adjudicative facts under Fed. R. Evid. 201." (*Korematsu v. United States,* 584 F. Supp. 1406, 1409, bolding added). *Korematsu* demonstrates that "concern" vs. "involve" are two different concepts.

Adjudicative facts "are facts about the parties and their activities, businesses, and properties, usually answering the questions of who did what, where, when, how, why, **with what motive or intent**; adjudicative facts are roughly the kind of facts that go to a jury in a jury case." (*Marshall v. Sawyer*, 365 F.2d 105, 111 (9th Cir. 1966) bolding added; *see also Castillo-Villagra v. I.N.S.*, 972 F.2d 1017, 1026 (9th Cir. 1992) (explaining that adjudicative facts are "those concerning the immediate parties")). The Past Historical Examples of involuntary human medical experimentation surely "concern" these defendants, especially on the issue of motive and intent.

These Defendants are motivated by the same factors as were, for example, the lobotomists. Then, as now, the motivation was at least two-fold: money and basic medical science. As alleged here, Defendants "are deliberately deceiving their minor patients to dupe them into participating in the [NIH] experiment that they received great amounts of money for." [2-ER-94]

Closely related to "adjudicative" facts are "relevant" facts. Courts define relevance broadly, stating that information is relevant "if it bears on or might reasonably lead to information that bears on any material fact or issue in the action." Under the federal rules of evidence, relevant evidence is evidence that "makes a fact more or less likely to be true." (Fed. R. Evid. 401).

The lobotomists, e.g. Walter Freeman, made money by presenting lobotomy as a safe & effective treatment for mental illness, just as Defendants here make money by presenting "gender affirming care" as a safe & effective treatment for

gender dysphoria. It is reasonable to infer that the lobotomists were motivated by money and basic medical science.

The fundamental problem with medical research is that well-informed subjects often will not consent. Accordingly, the Past Historical Example of lobotomy makes it more likely to be true that these Defendants are similarly motivated – to obtain consent, they must lie.

The Past Historical Examples are quite similar to the instant Hudacko matter. For instance, the doctors who conducted the Tuskegee and Guatemala Experiments knew the scientific value of their research, but also knew that the patients would not consent if they knew the whole truth. Therefore, it is reasonable to infer that those Doctors, as with the present Defendants, were motivated by money and by basic medical science. Much was learned about STDs with Tuskegee and Guatemala, just as much was learned about the brain structure through the decades of lobotomies.

So too it is with the Leo Stanley Experiments and the Nazi Experiments, which were concerned with sterilization methods, ala today's experiments by these Defendants sterilizing children under the guise of treating them for the psychological condition of "gender dysphoria." Just like these Defendants, those prior doctors were concerned with recruiting experimental subjects, and concerned with making money. They all knew that the money and the basic science was not possible *without the deception*.

### 5.    The Nuremberg Code is Law

After WWII, the United States and our allies adopted principles that would ultimately become codified as The Nuremberg Code, in turn the "principles of the Nuremberg Code have been incorporated into federal law." (*Winans v. Cox Auto.*, Inc., 669 F. Supp. 3d 394, 403, citing *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 182 (2d Cir. 2009) ("*Abdullahi*").

Turning to *Abdullahi,* we learn that international law categorically forbids medical experimentation on non-consenting human subjects:

> (1) the Nuremberg Code, which states as its first principle that "[t]he voluntary consent of the human subject is absolutely essential"; (2) the World Medical Association's Declaration of Helsinki, which sets forth ethical principles to guide physicians world-wide and provides that human subjects should be volunteers and grant their informed consent to participate in research; (3) the guidelines authored by the Council for International Organizations of Medical Services ("CIOMS"), which require "the voluntary informed consent of [a] prospective subject"; and (4) Article 7 of the International Covenant on Civil and Political Rights ("ICCPR"), which provides that "no one shall be subjected without his free consent to medical or scientific experimentation."

(*Abdullahi, supra* 562 F.3d 163 at 175)

"[N]on-consensual medical experimentation violates the law of nations and, therefore, the laws of the United States" (*Abdullahi* III, 2005 U.S. Dist. LEXIS 16126, 2005 WL 1870811, at *9. (*Id.*)

The United States prosecution of Nazi doctors and administrators in *United States of America v. Karl Brandt, et. al*. concerns these Defendants because there are substantial similarities – researching sterilization techniques and the utter lack of informed consent. [5-ER-516]

California adopted the Protection of Human Subjects in Medical Experimentation Act, which provides recovery for Nonconsensual Human Medical Experimentation. (Cal. Health & Saf. Code § 24170)

For these reasons, the Court should find that the Past Historical Examples "concern" these Defendants and "relate to" these Defendants, because it all goes directly to motive and intent (in addition to plausibility).

### 6. The Past Historical Examples are Not Reasonably Subject to Dispute Say Reliable Sources

In declining to take Judicial Notice of the Past Historical Examples, the District Court stated that "five of the six sources cited by plaintiff are Wikipedia pages, not sources whose accuracy cannot reasonably be questioned." [1-ER-8]

The party requesting judicial notice bears the burden of persuading the court that the particular fact is not reasonably subject to dispute and is capable of immediate and accurate determination by resort to a source whose accuracy cannot reasonably be questioned and supplying the court with the source material needed to determine whether the request is justified. (*In re Tyrone F. Conner Corp., Inc*., 140 B.R. 771, 781-82 (E.D. Cal. 1992); Fed. R. Evid. 201(b)).

The District Court appears to have ignored the credible sources Plaintiff provided in his Responses to Defendant's Objections. [2-ER-61], [2-ER-80]. Hudacko clearly met his procedural burden by filing "Request for Judicial Notice" [3-ER-165-454] that enumerated (1) the basis for taking judicial notice, and (2) the item to be noticed. (*William W. Schwarzer et al*., California Practice Guide: Federal Civil Procedure Before Trial ¶ 14:192 (1998), *Ervin v. Judicial Council of California*, 2005 U.S. Dist. LEXIS 56164, *8)

For each of the Past Historical Examples, Defendants disingenuously argued that "Plaintiff requests that the Court take judicial notice of a Wikipedia article." [2-ER-66, 68, 69, 71, 72, and 74] No, it is not the "Wikipedia article" for which Judicial Notice was requested. Rather, it is the historical fact that these unethical medical studies occurred.

It is true that Plaintiff provided links to Wikipedia for the Court's convenience, and it is also true that Wikipedia is not automatically a reliable source. If Wikipedia was the *only* source for an alleged fact, the District Court's reasoning might hold water. But such is simply not the case.

Indeed, after Defendants filed their objections to noticing the Past Historical Examples, Hudacko filed Plaintiff's Responses. [ER-80-98], [ER-61-79] In these papers, Hudacko provided numerous additional sources for the Past Historical Examples, many of them U.S. federal government sources, and the rest from the mainstream national news media.

For instance, facts about NIH's Guatemala STD study are presented at the National Library of Medicine [2-ER-86], and were described in an article in the New York Times titled "Syphilis Victims in U.S. Study Went Untreated 40 Years." [2-ER-66]. President Bill Clinton officially apologized for the Tuskegee Experiment, while President Barack Obama officially apologized for Guatemala. [2-ER-86].

In 2009 President Obama established by Executive Order 13521 the Presidential Commission for the Study of Bioethical Issues. In September 2011, this Presidential Commission published a report titled "ETHICALLY IMPOSSIBLE: STD Research in Guatemala from 1946 to 1948." [2-ER-87].

Regarding MKULTRA, Judicial Notice was requested of is the fact that the CIA conducted an operation called MKULTRA between 1953 –1973, under which people were unwittingly subjected to LSD. This was revealed in 1975 by the U.S. Senate Church Committee and President Gerald Ford's United States President's Commission on CIA Activities within the United States. Also documenting MKULTRA is Stephen Kinzer on National Public Radio "Fresh Air" "The CIA's Secret Quest for Mind Control: Torture, LSD and A 'Poisoner in Chief (September 9, 2019)." [2-ER-68].

Plaintiff requested Judicial Notice of the fact that lobotomies occurred, that they were held out as safe and effective, and that lobotomist Egas Moniz was awarded a Nobel prize.

As with the other Past Historical Examples, the relevance of lobotomy to "gender affirming care" is that, then as now, a disabling but profitable experimental

medical intervention was presented as safe & effective. Hudacko is not alone in comparing lobotomy to "gender affirming care." On 12/4/2024, the Solicitor General of Tennessee argued before the U.S. Supreme Court that:

> [T]here are certain times in medicine, history has shown, where the states in their traditional role as regulators have had to intervene. [O]f course, the parents are trying to do the best they can and get the best treatment for their kids, but we've had multiple instances in somewhat recent history where we have **stuff like lobotomy, eugenics**, **that had widespread acceptance among the medical community**, and the state had to intervene as a regulator to protect the children.

(J. Matthew Rice, Solicitor General, Nashville, Tennessee; on behalf of Respondents Jonathan Skrmetti, et. al. in U.S. Supreme Court case *U.S. v. Skrmetti*, cleaned up, bolding added [2])

To further document that lobotomy occurred and was held out as safe & effective, Hudacko provided a summary of the Nobel Prize in Physiology or Medicine from 1949, [2-ER-71] and an article from the Journal of Neurosurgery Psychosurgery entitled "Psychosurgery, ethic and media: a history of Walter Freeman and the lobotomy." [2-ER-72].

As to the Leo Stanley Experiments, Hudacko provided to the District Court several mainstream articles. The Cal. Dept. Corrections and Rehabilitation published "*San Quentin Doctor pushed prison medicine into 20th Century. Inside California Department of Corrections and Rehabilitation*." (November 18, 2018); and *The San Quentin prison doctor who performed over 10,000 human experiments,* published in the San Francisco Chronicle (May 2, 2022). [2-ER-72-73].

---

[2] U.S. Supreme Court Dec. 4, 2024, oral argument in *U.S. v. Skrmetti*, No. 43-477, transcript p. 141:22-142:9 https://www.supremecourt.gov/oral_arguments/argument_transcripts/2024/23-477_c07d.pdf

Therefore, all six of the Past Historical Examples can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. While inclusion in Wikipedia does not automatically make an alleged event true, not does it make it false. To contemplate the distinction, let us consider the cases on which the District Court evidently relied.

### 7. The Court Need Not Rely on Wikipedia

Defendants cited *BP Products North America, Inc. v. United States*, 716 F.Supp.2d 1291, 1295, n. 10 ("*BP Products*") and *Crispin v. Christian Audigier, Inc.*, 717 F.Supp.2d 965, 976, n. 19 (2010) for the proposition that "Wikipedia is not a source whose accuracy cannot reasonably be questioned" ("*Crispin*") [2-ER-136]. In both of those cases, the request for judicial notice involved an arcane piece of technical information, and for which Wikipedia was the *only* source.

In *BP Products,* the Court was asked to take Judicial Notice of the chemical formulation of "bitumen," where Wikipedia was the only source. (*BP Products, supra*, 2010 Ct. Intl. Trade LEXIS 64, *9) In *Crispin*, again citing only Wikipedia, party sought Judicial Notice that "webmail is a service that allows users to view email messages through a web browser while the messages remain on Media Temple's servers." (*Crispin v. Christian Audigier, Inc.*, 717 F. Supp. 2d 965, 976-977).

The Court in both *BP Products* and *Crispin* correctly ruled that Wikipedia was not a sufficiently reliable source. Another case explains why Defendants here falsely stated that Hudacko was seeking Judicial Notice *of Wikipedia articles,* rather than truthfully stating that Hudacko was seeking Judicial Notice of historical events:

> Numerous courts have held that Wikipedia pages are not sufficiently reliable to meet the requirement of Rule 201(b)(2). See, e.g. *Polanco v. E. Chigago Mach. Tool Corp.*, No. CV1108927MMMMRWX, 2012 U.S. Dist. LEXIS 196286, 2012 WL 12886209, at *4 (C.D. Cal. June 26, 2012) (**declining**

**take judicial notice of Wikipedia article** on the basis that it
was not sufficiently reliable)

(*Planet Drum Found. v. Hart*, 2017 U.S. Dist. LEXIS 156674, *15)

There is a world of difference between seeking Judicial Notice of a
"Wikipedia article" versus Judicial Notice of an historical event that happens to
have a Wikipedia article, but for which there were also numerous other sources
provided, including mainstream news articles and government publications.

**8.    It is Legal Error to Deny the Holocaust, Judge Illston is a
Holocaust Denier**

While all of the Past Historical Examples are significant, relevant and
"concerning" these defendants, perhaps the most important here are the Nazi
Experiments. After all, the Nazis doctors were, among other things, trying to learn
how to medically sterilize Jews for eugenics purposes. [3-ER-165].

Likewise, these Defendants are in the business of sterilizing children, and
conducting an NIH-funded study studying the long term effects of these
sterilization drugs.

The Nazi medical experiments led to the adoption of the so-called
Nuremberg Code, forever defining and mandating informed consent to medical
experiments. [6-ER-961] Notably, under the Nuremberg Code, the United States
successfully prosecuted a number of the Nazi doctors, some of whom were
executed, with others being incarcerated, and still others being acquitted. (*United
States of America v. Karl Brandt, et. al*.) The Nazi Medical Experiments were no
small part of the Holocaust.

The facts of the Holocaust, including the medical experiments, are both
generally known within the trial court's territorial jurisdiction *and* can be
accurately and readily determined from sources whose accuracy cannot reasonably
be questioned. And yet, the Hon. Susan B. Illston would not take Judicial Notice
of the Nazi Medical Experiments finding that Wikipedia is not a reliable source.
Accordingly, Judge Illston must now be viewed as a Holocaust Denier.

It should interest this Court to learn that there is precedent in the State of California for a judge taking Judicial Notice of the Holocaust as an historical fact. This occurred in October 1981, in the Los Angeles Superior Court case no. C356542, *Mel Mermelstein v. Institute for Historical Research, et. al*.

Mermelstein was a holocaust survivor and the author of "By Bread Alone." He filed suit against a group offering a $50,000 reward for anyone who could prove the Holocaust really happened. Without evidence, Hon. Thomas T. Johnson **took Judicial Notice** that the Holocaust was fact, finding that "Jews were gassed to death in Auschwitz in Poland in the summer of 1944." [3] [4] [5]

Judge Illston's status as a Holocaust Denier is not only pertinent to show that her decision to decline Judicial Notice should be reversed, but it also contributes to an understanding that Judge Illston is biased against Hudacko, or at least that she created the appearance of bias. The multiple grounds on which Judge Illston should be disqualified are discussed below in the section dedicated to that.

### 9. Conclusion to Judicial Notice and Dismissal of Conspiracy

In light of the foregoing, this Court should find that the District Court erred in declining to take Judicial Notice of the Past Historical Examples, and of the U.S. government officials alleging the same conspiracy that Hudacko alleges. The case

---

[3] *California Judge Rules Holocaust Did Happen* New York Times, October 10, 1981, Section 1, Page 26 https://www.nytimes.com/1981/10/10/us/california-judge-rules-holocaust-did-happen.html

[4] Sauer, Patrick, *Mel Mermelstein Who Survived Auschwitz, Then Sued Holocaust Deniers in Court, Dies at 95* Smithsonian Magazine, Updated: January 31, 2022 | Originally Published: August 27, 2018 https://www.smithsonianmag.com/history/mel-mermelstein-survived-auschwitz-then-sued-holocaust-deniers-court-180970123/

[5] Woo, Elaine *Thomas T. Johnson dies at 88; judge ruled that Holocaust was a fact* Los Angeles Times, Dec. 31, 2011 https://www.latimes.com/local/obituaries/la-me-thomas-johnson-20111231-story.html

should be remanded, with instructions to take Judicial Notice of the Past Historical Examples of involuntary human medical experimentation, and of the current raging national dispute over the facts around "gender affirming care," noting that all of this "concerns" and "relates to" these Defendants.

This Court should further find that the District Court's erroneous refusal to take Judicial Notice was material to its erroneous ruling that the Hudacko had failed to plausibly allege a conspiracy among these Defendants to commit involuntary human medical experimentation.

**B.** **The District Court Erred by Finding That the Non-Govt. Defendants are Not *De Facto* State Actors Under the Joint Action Test**

The District Court found that SAC has not alleged sufficient facts to allege any of the nominally private actors are *de facto* state actors under the Joint Action Test. As to Defendants Harkins, Bigger, and Underhill, the District Court ignores (rather than dispels) the factual allegations in the Complaint, and the facts for which Judicial Notice was requested and denied. Instead, the District Court heavily relies on a purported analogy to *Iqbal,* where the U.S. Supreme Court explained:

> The complaint alleges that Ashcroft was the 'principal architect' of this invidious policy, and that Mueller was 'instrumental' in adopting and executing it. These bare assertions, much like the pleading of conspiracy in *Twombly*, amount to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim. As such, the allegations are conclusory and not entitled to be assumed true. To be clear, we do not reject these bald allegations on the ground that they are unrealistic or nonsensical … It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth.

[1-ER-13-17]

Hudacko hereby incorporates by reference the detailed refutation of the *Iqbal* analogy from the previous section, under II A 2, "The District Court Ignores a

Litany of Facts Distinguishing *Hudacko* from *Iqbal*." To summarize, there exists a national debate about this conspiracy, from the President of the United States issuing an executive order explicitly calling out WPATH for "junk science," and calling the actions of these Defendants "chemical and surgical mutilation" of children. (90 FR 8771)

There exists a case pending before the United States Supreme Court – *Skrmetti* - which exemplifies the allegation of the conspiracy alleged here by Hudacko. In that case, high ranking government officials, including State Attorneys General, allege the same conspiracy that injured Hudacko. [3-ER-246-399]

The point is not to ask this Court to accept the truth of the factual allegations advanced by Trump and the "conservative" states. Rather, this Court is simply asked to acknowledge that there is a triable, factual dispute about whether these "treatments" have been proven safe & effective, or alternatively, that the people behind this "transgender medicine" are knowingly deceiving the public and their patients.

It is outrageous to say, as the District Court did in ruling, that Hudacko failed to allege facts pointing to a conspiracy. Documents presented as exhibits show that Defendants here plotted and schemed to perform (and bill $209,820.34 for) an entire course of "treatment" including Supprelin Implant, knowing that this gender identity related surgery violated a court order, knowing that they were lying about the supposed reversibility of puberty blockers, and so on. [6-ER-967]

Defendants Orr, Bigger, Underhill and Harkins are nominally private actors"), while Rosenthal, Ehernsaft and Lee are undisputedly State Actors. Private actors can be held as *de facto* state actors. (*Adickes v. S.H. Kress & Co.* 398 U.S. 144 (1970) ("*Adickes*"), and see also *Smith v. Brookshire Bros.*, 519 F.2d 93 (5th Cir. 1975); *Barrett v. Harwood*, 189 F.3d 297, 304 (2d Cir. 1999).

A nominally private actor becomes *a de* facto state actor when "the state has so far insinuated itself into a position of interdependence with the [defendant] that

it was a joint participant in the enterprise." *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1267 (11th Cir. 2003) ("*Focus*"), citing *Willis v. Univ. Health Servs.*, 993 F.2d 837 (11th Cir. 1993), quoting *National Broad. Co., Inc. ("NBC") v. Communications Workers of Am.*, AFL-CIO, 860 F.2d 1022, 1026-27 (11th Cir. 1988)) (other citations omitted). A court will examine whether the government and the acting party are "intertwined in a symbiotic relationship," as well as whether the relationship involves "the specific conduct of which plaintiff complains." *Id.*

Here, the WPATH Defendants and the Nominally Private Actors are intertwined in a symbiotic relationship, and the relationship does involve the specific conduct of which Plaintiff complains, i.e. the Scheme to greatly overstate the risk of "untreated" gender dysphoria, to maximize the profit of gender clinics by maximizing the number of people – especially children and adolescents – who seek "gender affirming care," to falsely proclaim psychological benefits, to fraudulently conceal the known and suspected physical and mental harms, to maximize the number of subjects unwittingly enrolled into experimental protocols, to create a population of young adults who are chronologically over 18 (thus legally able to consent to sex), but who physically, mentally and emotionally remain child-like. [6-ER-962]

The U.S. Supreme Court has found that under the "joint action" test a private party can be fairly said to be a state actor where a private party is a "willful participant in joint action with the State or its agents." *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 923, 102 S. Ct. 2744, 2746 (1982) ("*Lugar*").

Here, both WPATH Defendants and the Nominally Private Actors are all willful participants in the plan to commit involuntary human medical experimentation by performing gender identity related surgery on a minor without Hudacko's consent, and thus in violation of Hudacko's fundamental constitutional rights. [6-ER-824-826]

WPATH Defendants and the Nominally Private Actors are all willful participants in the plan to deceive Underhill into believing that "gender affirming care" is safe and effective so that she would consent on behalf of Minor Child. [6-ER-816-817]

Furthermore, WPATH Defendants and the Nominally Private Actors are all willful participants in the plan to conceal from Underhill and from the public at large the experimental nature of "gender affirming care" in general, and of the Supprelin Implant surgery in particular. [6-ER-975]

WPATH Defendants and the Nominally Private Actors are all willful participants in the plan to conceal from Hudacko their intentions to perform the Supprelin Implant, with each of them knowing that it would violate Hudacko's fundamental constitutional rights, as those rights were reiterated in the No Surgery Injunction. [6-ER-975]

Moreover, it is worth emphasizing that here, as in *Lugar*, WPATH DEFENDANTS and NOMINALLY PRIVATE ACTORS' concerted conduct in formulating, concealing and executing the Scheme and in advancing the True WPATH Mission worked to the mutual benefit of Defendants. The Scheme was successful, as WPATH Defendants were paid a total of at least $209,820.34 and Rosenthal obtained another subject for his NIH experiment, thus advancing the goals of the True WPATH Mission. Some part of that $209,820.34 ended up in the hands of each of the WPATH defendants and each of the Nominally Private Actors. [6-ER-973-976]

Under the "symbiotic relationship" test a private party can be fairly said to be a state actor where "the state has so far insinuated itself into a position of interdependence" with a private party that "it must be recognized as a joint participant in the challenged activity." *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).

Here, WPATH Defendants insinuated themselves into a position of interdependence with the Nominally Private Actors, as each got what they wanted by formulating, concealing and executing the Scheme. The WPATH Defendants get well paid and realize their professionals' financial goals by performing "gender affirming care" under the rubric of the gender clinic, while also continuing to justify the receipt of millions of dollars in NIH funding to continue the Experiment. The Nominally Private Actors realize their professional goals by receiving a paycheck for "legal services" rendered ostensibly for representing UCSF (Orr), Underhill (Biggers) and Minor Child (Harkins), but *in reality* representing and advancing the interests of the True WPATH Mission, which is substantially identical to the conspiracy alleged by President Trump and several "conservative" states' Attorneys General. [6-ER-931, 972-976]

Therefore, there is sufficient nexus between WPATH Defendants and Nominally Private Actors so as to find a "joint action" for purposes of 42 U.S.C. § 1983. This Court should reverse and remand the District Court dismissal.

### C.   The District Court Erred by Granting the UCSF Defendants Qualified Immunity

#### 1.   Legal Standard for Qualified Immunity

In what was characterized as a "clear," decision, the District Court did not determine whether Hudacko's constitutional rights were actually violated, but found that the UCSF defendants did not violate a "clearly established" constitutional right. "As such," continued Judge Illston, "they are entitled to qualified immunity." [1-ER-21]

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established … constitutional rights of which a reasonable person would have known." (*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The rule of "qualified immunity protects 'all but … those who knowingly violate the law.'" (*Saucier v.*

*Katz*, 533 U.S. 194, 202 (2001) ("*Saucier*") (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Hudacko had a clearly established constitutional right to direct the medical treatment of his minor child. This right was explicitly stated in an injunction prohibiting "any gender identity related surgery." The UCSF Defendants knew about the injunction – indeed UCSF is explicitly named in the court order. And, UCSF Defendants willfully violated the law when they experimented on Hudacko's minor child in violation of his long established fundamental right to parent his child.

### 2. Hudacko Had a Clearly Established Constitutional Right to Direct the Medical Care of His Minor Child

The U.S. Supreme Court has long interpreted the Liberty Clause to include a parent's right to control the medical procedures to which a minor child is subjected. As the Supreme Court has repeatedly observed, the "'liberty' specially protected by the Due Process Clause includes the right … to direct the … upbringing of one's children." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). That right is deeply embedded in "[t]he history and culture of Western civilization." *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972).

Upheld in "a long line of cases," *Glucksberg*, 521 U.S. at 720, the rights to custody and the upbringing of one's children are deemed "essential" and "far more precious … than property rights," *Stanley v. Illinois*, 405 U.S. 645, 651 (1972). See also *Troxel v. Granville*, 530 U.S. 57, 65 (2000) ("Troxel") ("The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court."); *Michael H. v. Gerald D.,* 491 U.S. 110, 123 (1989) (noting "the historic respect—indeed, sanctity would not be too strong a term—traditionally accorded to the relationships that develop within the unitary family"); *Santosky v. Kramer*, 455 U.S. 745 at 753 (The Due Process Clause protects parents'

"fundamental liberty interest … in the care, custody, and management of [their] child[ren].")*; Wallis ex rel. Wallis v. Spencer*, 202 F.3d 1126 at 1136 ("Parents and children have a well-elaborated constitutional right to live together without governmental interference," a "liberty interest protected by the Fourteenth Amendment[.]" ).

Regarding the Fourteenth Amendment, and in the context of the fundamental right to parent, U.S. Supreme Court instructs:

> The court has long recognized that the amendment's Due Process Clause, like its U.S. Const. Amend. V counterpart, guarantees more than fair process. The Clause also includes a substantive component that provides heightened protection against government interference with certain fundamental rights and liberty interests.

(*Troxel, supra,* 530 U.S. 57 at 60)

*Troxel* unambiguously finds the right to parent to be a *fundamental* constitutional right. What is more, that constitutional parental right includes the right to "make … judgments" about a minor child's medical care. *Parham v. J.R.*, 442 U.S. 584, 603 (1979).

The Court should find that the right for a parent to make medical decisions is a clearly established, fundamental constitutional right.

### 3. The No Surgery Injunction Arose from Hudacko's Clearly Established Constitutional Right

Hudacko and his now ex-wife (Defendant Christine Underhill) were embroiled in a high-conflict Family Law case. The point of contention was that Underhill believed that their son – then a minor – suffered from the psychological condition of "gender dysphoria," and wanted to him to medically "transition" their son from being a boy to being a girl. [6-ER-966]

An August 2020 Court Order awarded Underhill legal custody (thus medical decision-making authority) over the minor child, thus stripping Hudacko of most of his fundamental constitutional parental rights. However, the Court Order

contained an explicit exception to Underhill's medical authority, in the form of an injunction, hereafter termed the NO SURGERY INJUNCTION, which states:

> [The minor child] will not be permitted to undergo any gender identity related surgery until they are 18 years of age, absent a written agreement by both parties, Christine [Underhill] and Edward Hudacko, or an order of the court.

[6-ER-993]

While it was articulated in a Family Law custody order, the No Surgery Injunction clearly arises under the U.S. Constitution, as held in *Troxel, supra, Parham, supra*, and the other constitutional cases that unambiguously stand for the proposition that a parent has the fundamental constitutional right to control the medical decisions of the child.

In dismissing the complaint, the District Court found that Hudacko failed to show a "clearly established" fundamental constitutional right. "The parties do not dispute that the rights of parents to make child-rearing decisions is a liberty interest," admits the District Court. But citing *Saucier, supra*, 533 U.S. at 201, the District Court opines that "the relevance of that right to the 'specific context' of this case is disputed." [1-ER-19]

Turning to *Saucier,* we find that:

> The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [state actor] that his conduct was unlawful in the situation he confronted.

(*Saucier, supra*, 533 U.S. 194 at 202, citing *Wilson v. Layne*, 526 U.S. 603, 615, 143 L. Ed. 2d 818, 119 S. Ct. 1692 (1999))

Here, the situation that Defendants confronted was the explicit language of the No Surgery Injunction. The unlawful nature of performing this particular gender identity related surgery in this situation was clearly established, given the existence of a court order prohibiting "***any*** gender identity related surgery." [6-ER-993, emphasis added]

The Court order clarifying Hudacko's constitutional right is precisely the type of "specific context" contemplated in *Saucier,* but which the District Court seemingly ignores. The UCSF Defendants "knew about the No Surgery Injunction, thus knew that any such surgery was prohibited, absent Hudacko's written consent." [6-ER-966]

Defendants and the District Court concede that medical decision-making is a clearly established liberty interest, and concede that a court order in this specific context prohibits exactly what UCSF Defendants did. The question then inescapably becomes:

> *If Hudacko's right to prohibit surgery did not arise under his clearly established liberty interest, then where else could it have possibly originated?*

Was it a mere court-created right? Certainly the answer must be "no." The minor child's mother was still alive, and was being awarded child custody. Is there any legal theory under which any person *other* than the child's father (holding clearly-established parental rights) could have been given the authority to prohibit "any gender identity related surgery" on the minor child? If there is any answer to that question, neither the District Court nor Defendants have provided one.

Other than Hudacko retaining some part of his clearly established, fundamental constitutional parental rights under the Liberty Clause, there is no legal theory under which a Family Court judge could possibly have issued the No Surgery Injunction. This Court should therefore find that Plaintiff's explicit right to prohibit "any gender identity related surgery" on the minor child arose from his clearly established parental rights under the Liberty Clause of the U.S. Constitution.

### 4. The District Court Failed to Assume Hudacko's Alleged Facts

In considering a motion to dismiss under rule Fed. R. Civ. Pro. 12(b)(6), "the district court must take as true all facts as alleged by plaintiff." (*Experimental Engineering, Inc. v. United Technologies Corp.*, 614 F.2d 1244, 1245.)

A Motion to Dismiss is not the time to weigh the evidence. (*Jones v. Johnson*, 781 F.2d 769, 772, n. 1 (9th Cir.1986) ("[A]ny weighing of the evidence is inappropriate on a 12(b)(6) motion."); *Glen Holly Entertainment, Inc. v. Tektronix, Inc.*, 100 F.Supp.2d 1086, 1089 (C.D. Cal. 1999) ("On a motion to dismiss, the Court evaluates only the legal sufficiency of a complaint and not the weight of the evidence supporting it.").

As part of its explanation for why UCSF Defendants were shielded by qualified immunity, citing *Carroll v. Karman*, 574 U.S. 13 at 16 ("*Carroll*"), the District Court stated:

> Further, the Court is not persuaded by plaintiff's apparent argument that defendants violated a "clearly established" Constitutional right because Section 7b of the custody order (plaintiff's ability to withhold consent to surgical procedures) overrides Section 7a (Minor's ability to pursue hormone therapy if recommended by UCSF).
>
> Reasonable doctors or lawyers **could have believed** the Supprelin implant was part of or an adjunct to the type of hormone therapy specifically permitted by Section 7a of the custody order. See SAC ¶ 76. While a court **might conclude defendants wrongly believed** the procedure was permitted without plaintiff's consent, the correct interpretation of these provisions of the custody order was not "beyond debate."

[1-ER-21]

The District Court misreads *Carroll*. Citing *Ashcroft v. al-Kidd*, 563 U.S. at 741, *Carroll* says it is the "constitutional question [which must be] beyond debate," not the interpretation of a Court Order. *Carroll* is further distinguished from the instant matter. *Carroll* had nothing to do with parental rights. Rather, it was a

Fourth Amendment case where police officer Carroll was sued for entering a property without a warrant.

Moreover, the facts in *Carroll* were not in dispute, and certainly not in dispute regarding what officer Carroll believed at the time of the incident. There, police officers responded to a call about a stolen vehicle and stolen guns. The officers ended up entering the house with the consent of the owner, but did not find the suspect. (*Carroll, supra*, 574 U.S. 13 at 15)

The homeowners sued officer Carroll under § 1983, but at no time did Plaintiffs allege that officer Carroll knew or believed he was violating the law. It would have been implausible to do so under those circumstances. Here, by contrast, Hudacko certainly does allege that the UCSF defendants knew they were deliberately deceiving the public and all involved. While it is not the time to weigh evidence, there is certainly strong evidence to support Hudacko's allegations, e.g. obtaining consent from Underhill only by falsely stating that the loss of brain development is reversible.

A genuine factual issue is an issue that may be reasonably drawn in favor of either party. (*Iida v. Allied Signal (In re Hawaii Fed. Asbestos Cases),* 854 F. Supp. 702, 704) In dismissing this case, District Court states in no uncertain terms that Defendants "could have" believed that the Supprelin Implant was legal, which of course means that they "could have" believed that it was illegal. However, what Defendants knew and believed is a genuine factual issue, not an issue of law upon which the District Court may decide a Motion to Dismiss. "The … belief, and the knowledge of defendant are necessarily **questions of fact**…" (*Vernon v. Plumas Lumber Co*., 71 Cal. App. 112, 114, bolding added)

Whatever the defendants "could have believed" is completely irrelevant at the pleading stage. The District Court was required to assume that "[e]ach Defendant knew about the No Surgery Injunction, thus **knew that any such surgery was prohibited**, absent Hudacko's written consent." [6-ER-966]

### 5. Conclusion to Qualified Immunity

Accordingly, this Court should reverse the District Court finding that qualified immunity shields the UCSF Defendants. This Court should find that Hudacko's right to prohibit "any gender identity related surgery" arises from his clearly established constitutional right to parent. This Court should further find that the District Court failed to assume Hudacko's factual allegations were true. For that reason, this Court should reverse, mandating the Defendants answer the complaint. Defendants will then be free to dispute the facts about what they knew and what they believed.

### D. The District Court Erred by Dismissing the Claims for Fraudulent Concealment

#### 1. Orders of Dismissal and Legal Standard

Citing Dkt. No. 86 at 23-24, the District Court's order dismissing the SAC explains that it previously granted a motion to dismiss plaintiff's FAC fraudulent concealment claim, without leave to amend as to Defendants Bigger, Harkins, and Orr, and with leave to amend as to Rosenthal, Ehrensaft, Lee, and Underhill. [1-ER-22]

Citing *Graham v. Bank of Am., N.A.*, 226 Cal. App. 4th 594, 605-06, the District Court explains that required elements to plead fraudulent concealment include that the defendant owed "a duty to disclose the fact to the plaintiff." Fraudulent Concealment was dismissed in the FAC with a finding that "Plaintiff alleges no … relationship with any of the defendants that could give rise to a duty to disclose." [1-ER-50] Similarly, Fraudulent Concealment was dismissed from the SAC because "plaintiff still has not established that any of the [UCSF] defendants had a 'duty to disclose' facts to plaintiff." [1-ER-23]

Plaintiff alleges the UCSF defendants had a duty to refrain from "involuntary human medical experimentation" and to obey the No Surgery Injunction [6-ER-980]. "To the extent such a duty exists," continues the District Court, "plaintiff

does not cite legal authority or otherwise explain how this translates to a "duty to disclose" information to plaintiff. [1-ER-23]

It will be shown that Defendants' requisite duties were indeed argued to the District Court, and that the dismissals of the Fraudulent Concealment claims (in both the FAC and the SAC) were erroneous.

### 2. Defendants Owed a Duty to Disclose to Hudacko the Experimental Nature of the Supprelin Implant

#### a) A Special Relationship Between Defendants and Plaintiff Was Established Upon the Issuance of the Family Court Order Explicitly Naming "UCSF"

Citing Dkt # 90, SAC, Exhibit A, in opposing Defendants' Motions to Dismiss, Plaintiff argued as follows. The UCSF Defendants all work at University of California at San Francisco ("UCSF"). UCSF was explicitly granted special powers, and thus a special relationship between UCSF and both parties to the Hudacko-Underhill Family Law case was established on August 26, 2020 when the Family Court made numerous orders explicitly naming UCSF as in-charge, and explicitly naming other providers as out:

> a. [Minor] shall be permitted to pursue the services provided by UCSF as to [Minor's] gender identity, and shall be permitted to commence hormone therapy, if recommended by UCSF.
>
> b. [Minor] will not be permitted to undergo any gender identity related surgery until they are 18 years of age, absent a written agreement by both parties, Christine [Underhill] and Edward Hudacko, or an order of the court.
>
> c. Mother shall ensure that [Minor] receives an annual physical examination by their medical physician. This has already occurred during the summer of 2020.
>
> d. [Minor] shall not be required to undergo a neuropsychological evaluation, unless recommended by UCSF.
>
> e. Spencer shall not participate in any assessment by Dr. Craig Childress absent a written agreement by both parties, Christine [Underhill] and Edward Hudacko, or a showing of a substantial change of circumstances and an order of the court.

e. [Minor] shall not participate in any assessment by Dr. Kenneth Zucker absent a written agreement by both parties, Christine [Underhill] and Edward Hudacko, or a showing of a substantial change of circumstances and an order of the court.

f. [Minor] shall not participate in any assessment or services offered by Dr. Childress, Dr. Devita Singh, Dr. Zucker, Dorcy Pruter or Dr. Warshak absent a written agreement by both parties, Christine [Underhill] and Edward Hudacko, or a showing of a substantial change of circumstances and an order of the court.

[6-ER-828-829]

Because UCSF is explicitly named in the relevant court order, and granted special decision-making powers, the Court should find that a special relationship existed between UCSF and Plaintiff sufficient to establish that UCSF owed a duty to Hudacko to disclose the experimental nature of the Supprelin Implant.

### b) Defendants Owed and Breached a General Duty of Care by Reciting the "Playbook"

Every person's general duty is a matter of statutory, black-letter law. "Everyone [including these UCSF Defendants] is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself or herself. (Cal. Civ. Code § 1714 (a)).

Cal. Civ. Code § 1714 articulates a general duty of care. While policy considerations can support exceptions, none apply here. *Rowland v. Christian, 69 Cal. 2d 108* identified several considerations that may, on balance, justify a departure from Cal. Civ. Code § 1714's default rule of duty. Such considerations include, among others, the foreseeability of harm to the plaintiff, the moral blame attached to the defendant's conduct, the policy of preventing future harm, and the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach.

The Supreme Court of California identified foreseeability as the most important factor to consider in determining whether to create an exception to the general duty to exercise ordinary care under § 1714. (*Kuciemba v. Victory Woodworks, Inc.*, 74 F.4th 1039, 1040, citing *Rowland v. Christian*, 69 Cal. 2d 108, 69 Cal. 2d 108).

Here, it was clearly foreseeable that Hudacko would suffer extreme emotional distress by the actions that Defendants planned and ultimately executed – sterilizing of his son under the false pretense of "medically necessary" health care. [6-ER-970, 979]

In addition to sterility, the use of "puberty blocking" drugs (such as the Supprelin specifically at issue here) is known to diminish bone density and known to inhibit brain development during critical windows of opportunity [6-ER-955]

Thus, under Cal. Civ. Code § 1714 these medical defendants owed a general duty to refrain from obtaining consent to experimental puberty blockers by falsely claiming that the negative effects on brain development are reversible. [6-ER-955]

No medical professional exercising "ordinary care or skill" would deliberately deceive the public, the patient and the patient's mother by concealing the permanent negative effects on brain development.

Presumably Defendants will assert that their conduct conforms with WPATH's Standard of Care-8, and indeed it does. The problem is that the "Standard of Care-8" is itself fraudulent. The recommendations in SOC-8 are not supported by high-quality medical evidence. [6-ER-961]

Rather, SOC-8 is supported by the "Playbook" – a set of dishonest and/or misleading contentions and/or misrepresentations of fact, regarding the purported safety and efficacy of employing "gender affirming care" on children. Such contentions and representations have been crafted and routinely disseminated by the members of WPATH – i.e. these Defendants – for the purpose of advancing the True WPATH Mission. [6-ER-960]

The "Playbook" includes, but is not limited to, the false representation that puberty blockers are a "pause button" on pubertal development, fully reversible, and that "gender affirming care" is safe and proven effective at treating the psychological condition of gender dysphoria. [6-ER-960]

As to the foreseeability of harm to the plaintiff and the moral blame attached to the Defendants' conduct, is there anything more distressing to a father than his son being sterilized without his consent and his son's brain and bone development being irreversibly halted under false and fraudulent pretenses? These Defendants all knew that Plaintiff did not and would never approve of a Supprelin Implant, which is why they were forced to conceal the whole plan from him. [6-ER-955-956] Hudacko's severe emotional distress was imminently foreseeable.

Thus, the UCSF (WPATH) Defendants owed a general duty to act as reasonable persons, to disclose their economic interests in medically experimenting on the minor and breached these duty by deceiving the public, deceiving Underhill (who never would have consented knowing the truth), and executing the Playbook to advance the True WPATH Mission. [6-ER-960]

### c) Defendants Waived the "No Duty" Defense by Voluntarily Speaking Falsely

Courts have explained how and why Defendants have waived that defense in this instance:

> "[T]hough one may be under no duty to speak as to a matter, if he undertakes to do so . . . he is bound not only to state truly what he tells but also not to suppress or conceal any facts within his knowledge which materially qualify those stated." *Brady v. Carman*, 179 Cal.App.2d 63, 68, 3 Cal. Rptr. 612 (1960); see also *Moore v. IMCO Recycling of CA, Inc.,* No. CV 04-1304 DSF (VBKx), 2005 U.S. Dist. LEXIS 45779, 2005 WL 5887179, *4 n. 7 (C.D. Cal. June 29, 2005) ("The theory of fraud by concealment is that one who is asked for **or volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud**".

48
APPELLANT'S OPENING BRIEF

(*Toneman v. United States Bank*, 2013 U.S. Dist. LEXIS 196516, *53-54, bolding added)

UCSF Defendants waived the "no duty" defense by volunteering information that was not truthful. In particular, while admitting that there is "a delay of typical adolescent cognitive or brain development while on [puberty blockers]," Defendants voluntarily stated that "[Brain development] will resume when not taking the blocker" [6-ER-1006]

When UCSF Defendants stated that brain development will resume when not taking the blocker, they were not mistaken, they were lying. UCSF Defendants all knew at all relevant times that there was no credible science establishing the "reversibility" of puberty blockers. [6-ER-955]

Asaf Orr also voluntarily spoke falsely, thus waiving his "no duty" defense, when he publicly stated in a CLE seminar:

> "[Puberty blockers are] just a pause button so that if you remove the medication, puberty comes back as it was. There's no effect to fertility, no effect to anything."

…

> "Puberty blockers are fully reversible. 100% reversible."

[6-ER-964]

Just like the UCSF Defendants, Asaf Orr knew at all relevant times that puberty blockers are not fully reversible, that they can affect fertility, and they have other detrimental effects as well. [6-ER-964]

### 3. Conclusion to Fraudulent Concealment

Therefore, this Court should reverse the dismissal of Plaintiff's claim for Fraudulent Concealment, finding that defendants owed a Special Duty to disclose to Hudacko the experimental nature of a Supprelin Implant; that this duty arises by virtue of the special relationship established in the August 26, 2020 Order, and/or under the Cal. Civ. Code § 1714 (a) general duty, and/or that they waived the "no duty" defense by voluntarily speaking falsely.

### E. The District Court Erred by Dismissing the Claim for Intentional Infliction of Emotional Distress

#### 1. The Court Dismissed, Finding Defendant's Conduct Not "Outrageous"

The District Court dismissed Hudacko's claim for IIED without leave to amend, finding that "Plaintiff has insufficiently pled that defendants intended to cause, or recklessly disregarded a probability of causing, him emotional distress." The Court further finds that defendants' alleged conduct was not "outrageous." [1-ER-52-53]

#### 2. The District Court Again Fails to Assume Hudacko's Facts

Again, the District Court fails to assume Hudacko's facts. In particular, the District Court ignores the alleged facts regarding the reality of "gender affirming care" (i.e. sterility, loss of brain function, loss of bone density combined with never have been proven safe *or* effective); and ignores the facts regarding Defendants knowledge and intentions (i.e. that Defendants *knew* the reality of Supprelin, that they deliberately concealed that reality from the public and from Hudacko, and that they did so to not only make money off the "treatment," but also to unwittingly enroll Minor Child (and many others) into a medical experiment).

"Questions of **subjective intent** are considered **proper issues for the jury** and good or bad faith which are to be inferred from all the circumstances involved in the particular case are **inherently factual inquiries.** Subjective intent is usually a matter of inference to be derived from all of the objective facts and evidence. (*Rosedale Plaza Group, LLC v. BP West Coast Products LLC*, 665 F. Supp. 2d 1118, 1134-1135, citing *Tiller v. Amerada Hess Corp.,* 540 F.Supp. 160, 165 (D.S.C.1981)).

The District Court notes that, in addition to containing the No Surgery Injunction, the family law custody order states that the minor "shall be permitted to pursue the services provided by UCSF as to [Minor's] gender identity, and shall

be permitted to commence hormone therapy, if recommended by UCSF." [1-ER-4]

The District Court errs when it finds that the Supprelin Implant procedure "could reasonably interpreted to be" hormone therapy and not gender identity related surgery. [*Id*] What Defendants knew and believed, and what motivated them, and how any factual dispute "could reasonably be interpreted to be" simply doesn't matter at the pleading stage. What does matter is the facts that are plausibly alleged and that they are required to be accepted as true by the Court at the pleading stage.

Here, there is no question that Defendants are alleged to have a malicious state of mind. [1-ER-14] [3-ER-371] [5-ER-722] [7-ER-1137] [8-ER-1407] Given the large number of government officials – from the President of the Unites States on down – alleging the same conspiracy, Defendants' malicious intent is plausible.

The District Court admits that "it is inappropriate for the Court to make a final determination on this issue on the pleadings." Nevertheless, citing *Cochran v. Cochran*, 65 Cal. App. 4th 488, 496 (1998) and Rest. 2d Torts § 46, the District Court states:

> … even if it is ultimately determined on the merits that the procedure was a "gender identity related surgery" under the custody order, given the above considerations the conduct alleged is simply not "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

[1-ER- 53]

The District Court clearly ignores the factual allegations regarding Defendants' malicious intent. *Any* claim can be downplayed into insignificance when the most serious aspects of the allegations are ignored.

If Defendants are ultimately found to have innocently believed they had the right to perform a Supprelin Implant, and ultimately found to have genuinely

believed that doing so was a safe & effective medical treatment for gender dysphoria, then this would likely not constitute conduct that was outrageous. But only the jury can make those factual findings.

At the pleading stage, the District Court was required to assume that Defendants are lying to the public, the patients and their parents, including but not limited to the people in this case, that they are doing so to falsely obtain the appearance of informed consent, that they know these drugs are harmful and experimental, indeed disabling, that they are surreptitiously enrolling children into the multi-million dollar NIH medical experiment, that they are sterilizing children who cannot appreciate the long-term consequences on mental or physical health, damaging brains and bones in the process. If that is not outrageous, what is?

The alleged conduct of these Defendants is no different than the Nazi doctors who performed involuntary human medical experimentation 80 years ago. The United States prosecuted, convicted and, in some cases, *executed* those doctors. There is certainly a triable case here.

### 3.     Conclusion to IIED

This Court should reverse the dismissal of the IIED claim, finding that the District Court failed to assume the factual allegations as true, particularly with regard to Defendants' knowledge and motivations.

### F.     Judge Illston Should Be Disqualified For Demonstrating Bias Against Hudacko

### 1.     Legal Standard to Disqualify a Judge

Under 28 U.S.C. § 455(a), a judge must disqualify herself if her impartiality might reasonably be questioned; under 28 U.S.C. § 455(b)(1), disqualification is appropriate if the judge has a personal bias or prejudice against a party. The judge whom a party seeks to disqualify rules on the request. *Bernard v. Coyne (In re Bernard)*, 31 F.3d 842, 843 (9th Cir. 1994).

### 2. Raising the Issue of Judicial Bias for the First Time on Appeal

Failure to raise the issue of judicial bias in the district court does not necessarily bar a litigant from raising the issue on appeal. Indeed, we have explicitly held that a litigant can raise the issue for the first time on appeal. See *In re Manoa Finance Co.*, 781 F.2d 1370, 1373 (9th Cir. 1986) (per curiam), cert. denied, 479 U.S. 1064 (1987); *United States v. Sibla*, 624 F.2d 864, 868 (9th Cir. 1980). *United States v. Bosch*, 951 F.2d 1546, 1552.

### 3. Judge Illston Demonstrated Judicial Bias Against Hudacko

#### a) No Legal Authority Supports "Abstention" from Ruling on Motions to Dismiss

In addition to filing this federal lawsuit, Hudacko also filed a Family Law Contempt action in the Superior Court. It is certainly true that the facts underlying both actions were the same – Defendants conspiring to willfully violate the explicit terms of the No Surgery Injunction. Legally speaking, however, the actions are not the same.

Hudacko's Family Law Contempt sought *quasi-criminal* remedies on behalf of the Court *only*, with exactly nothing in it for him. The Contempt could not have been brought in federal court, or any court besides the Court that issued the No Surgery Injunction, i.e. the Family Court. On the other hand, Hudacko filed this federal case alleging the violation of his federal rights, pleading intentional torts, seeking compensation for emotional and financial damages, plus punitive damages, and demanding a jury trial. For each of those reasons, it was not possible for Hudacko to have brought this action in Family Court. (See e.g. *Bidna v. Rosen*, 19 Cal. App. 4th 27, 30).

Defendant Asaf Orr cites perfectly good law (*Peterson v. Babbitt*, 708 F.2d 465, 466 (9th Cir. 1983), *Moore v. Sims*, 442 U.S. 415, (1979); *Coats v. Woods*, 819 F.2d 236, 237 (9th Cir. 1987)) for the utterly specious contention that this case should be subject to an abstention doctrine. [8-ER-1448] It is true the "federal

courts must decline jurisdiction of cases concerning domestic relations when the primary issue concerns the status of parent and child or husband and wife," as Orr states, citing *Buechold v. Ortiz*, 401 F.2d 371, 372 (9th Cir. 1986).

But it was simply false for Orr to assert that this federal case "arises from a child custody dispute." [8-ER-1448] This federal case arises because Defendants intentionally injured Hudacko under federal and state law, with no remedies available in Family Court.

Notably, neither Orr nor any Defendant filed any motion for the District Court to abstain. Nevertheless, on 02/05/2024, the District Court *sua sponte* issued ORDER RE: UPDATE ON FEBRUARY 2, 2024 STATE COURT CONTEMPT PROCEEDING stating:

> Plaintiff filed an order to show cause and affidavit for contempt in the Superior Court of California, County of Contra Costa on September 29, 2023 seeking to hold citees Christine Hudacko, Nathaniel Bigger, and Daniel Harkins in contempt for violating a custody order issued by that court. See Dkt. No. 32-3; Dkt. No. 50-2. These citees are defendants in the present action and plaintiff's pleadings in the state court proceeding raise some of the same allegations as his complaint before this Court. The Court thus ORDERS the parties to submit a short statement by February 7, 2024 updating this Court about the status and outcome of the February 2, 2024 Contra Costa Superior Court contempt proceeding.

[1-ER-59]

Conspicuously absent from the District Court's order was any mention of the fact that UCSF was a citee to the Contempt. [7-ER-1153] Yes, Family Law Judge Benjamin Reyes initially denied the Contempt against UCSF, finding "UCSF is not a party. This Court has no jurisdiction." [7-ER-1146].

Hudacko immediately challenged the erroneous order denying jurisdiction over UCSF, because a nonparty to an injunction is subject to the Contempt power of the Court when, with the knowledge of the injunction, the nonparty violates its

terms with or for those who are restrained. (*People v. Conrad* (1997) 55 Cal.App.4th 896, 64 ("Conrad")).

Regardless, there was never any basis for the District Court to abstain. The point of federal abstention doctrines is to avoid a possible conflicting ruling with the State Court. Because Hudacko did not seek remedies for himself, in essence he was not even a party to Family Law Contempt. There was never even a slight possibility of conflicting rulings. Moreover, as the Ninth Circuit explains, even that is not enough:

> The mere potential for conflict in the results of adjudications does not, without more, warrant staying exercise of federal jurisdiction, much less abdicating it entirely. Rather, abstention is only appropriate in the narrow category of circumstances in which the federal court action would actually enjoin an ongoing state proceeding, or have the practical effect of doing so.

(*AmerisourceBergen Corp. v. Roden*, 495 F.3d 1143, 1144)

Judge Illston never even *attempted* to apply the law to this situation, not when she issued her 02/05/2024 Order, and not on 05/17/2024 when actually did abstain from ruling on the Motions to Dismiss. [1-ER-58] Quite simply, Judge Illston just decided to not rule on the Motions to Dismiss, with no legal basis for abstention whatsoever. In fact, when abstention is appropriate, the court **must dismiss the action without prejudice**. (*Beltran v. California*, 871 F.2d 777, 782 (9th Cir. 1988), emphasis added.) To abstain from ruling on a particular motion is unprecedented, and appears to be something Judge Illston just made up.

Later on 05/17/2024, knowing that Judge Illston had decided to "abstain" from ruling at all, Plaintiff filed "a notice of withdrawal of the contempt actions." [1-ER-32] After all, the *criminal* Contempt action was not for Hudacko's benefit, it was brought only in an attempt to vindicate the authority of the Court. [7-ER-1170

This Court should find that by acting as she did regarding the "abstention" issue, Judge Illston demonstrated actual bias against Hudacko.

> **b) Judge Illston Fashioned Defendants' Qualified Immunity Argument for Them**

Citing Dkt. No. 86 at 30, Judge Illston states that she "previously concluded the UCSF defendants (Ehrensaft, Rosenthal, Lee, and Orr) **could argue for qualified immunity** in subsequent proceedings." [1-ER-18].

It is unreasonable for the District Court to say that it "concluded" that the UCSF defendants could argue for qualified immunity. By use of the word "concluded," a reasonable person would assume that the UCSF defendants had raised the issue of qualified immunity, that the issue was argued on both sides, and that the Court then reached a conclusion. Regarding the First Amended Complaint, there was not one word written by any of the parties about qualified immunity.

Unsurprisingly, the WPATH (i.e. UCSF) Defendants then did argue qualified immunity when moving to dismiss the SAC. Of course, Judge Illston ultimately dismissed the case, finding the WPATH defendants were shielded by qualified immunity. This Court should find that Judge Illston showed bias against Hudacko by fashioning Defendants' arguments for them, as if she was their attorney.

> **c) Judge Illston Denied Facts on Behalf of Defendants**

The District Court errs when it finds that Supprelin Implant "could reasonably interpreted to be" hormone therapy and not gender identity related surgery, thus not prohibited. [1-ER-4] Defendants are alleged to have understood and believed they performed a surgery. Supprelin Implant was categorized as "SURGERY" on the Claim Detail for the insurance billing. [1-ER-967] Again, what Defendants knew and believed is a *factual* matter. Defendants are not allowed to deny the facts, and Judge Illston had no business doing it for them.

#### d) Judge Illston is a Holocaust Denier

According to Judge Illston, it is still subject to reasonable dispute whether the Nazi Medical Experiments took place. [1-ER-7] The Holocaust is subject to Judicial Notice. (*Supra*).

This places Judge Susan B. Illston squarely among the ranks of Holocaust deniers. A Holocaust Denier *ipso facto* lacks the discernment to be a fair and impartial judge because such a historically recognized fact is not reasonably subject to dispute by any well reasoning person.

#### 4. Conclusion to Disqualification

Judge Illston should be disqualified and Hudacko so requests.

## VII. OVERALL CONCLUSION AND RELIEF REQUESTED

In light of the foregoing, Hudacko respectfully requests that this Court reverse and remand the dismissals by the District Court and order that Judge Illston be disqualified.

Respectfully submitted,

_____

TRACY L. HENDERSON, ESQ.

Attorney for Appellant

## VIII.  CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,924 words excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman 14-point font.

Respectfully submitted,

_____

Tracy L. Henderson, Esq.

Attorney for Appellant

## IX.  CERTIFICATE OF SERVICE

I am employed in the State of California, over the age of eighteen years, and not a party to the within action. My business address is P.O. Box 221562, Carmel, CA  93922-1562.

On February 26, 2025 I served the following document(s):

APPELLANT'S OPENING BRIEF; EXCERPTS OF RECORD ("ER") Index Volume,  ER Vol. 1, ER Vol. 2, ER Vol. 3, ER Vol. 4, ER Vol. 5, ER Vol. 6, ER Vol. 7, ER Vol. 8 and ER Vol. 9

To the following individuals:

| | |
|---|---|
| Alexandra C. Seibert<br>Hassard Bonnington LLP<br>Attorney for Defendants Regents of the University of California, Janet Yi Man Lee MD Diane Ehrensaft, PHD, Stephen Rosenthal, MD<br>Email: acs@hassard.com | Kevin Randall Mintz<br>Rankin, Shuey, Mintz, Lampasona & Harper<br>Attorney for Defendant Asaf Orr<br>Email: mintz@rankinlaw.com |
| Fred W. Schwinn<br>Consumer Law Center, Inc.<br>Attorney for Defendants Nathaniel Bigger and Christine Hudacko<br>Email: fred.schwinn@sjconsumerlaw.com | Michael Lloyd Smith<br>Manning & Kass, Ellrod, Ramirez, Trester LLP<br>Attorney for Defendant Daniel Harkins<br>Email: michael.smith@manningkass.com |

### METHOD OF SERVICE

[√] (BY E-MAIL OR ELECTRONIC TRANSMISSION) My email address is tlhlaw@protonmail.com. I used the e-serve function in the ECF-PACER filing system.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct. Executed February 26, 2025, at Carmel, California.

Respectfully submitted,

_____
Tracy L. Henderson, Esq.